```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF OHIO
                       EASTERN DIVISION
```

Christine M. Kraras, M.D., :
et al.,
                                :

       Plaintiffs,
                                :
   v.                              Case No. 2:98-cv-0169
                                :
Safeskin Corporation, et al.,    JUDGE SMITH
                                :
       Defendants.

<u>ORDER AND REPORT AND RECOMMENDATION</u>

    This matter is before the Court on the motion of plaintiffs Christine Kraras, Jeffrey Boorstein, Rebecca Boorstein, and Katherine Boorstein to withdraw the stipulation of dismissal of their claims against defendant Safeskin Corporation and on defendant Safeskin's motion to enforce the settlement agreement. On April 23, 2004, these motions were referred to the undersigned to conduct a hearing. On July 19, 2004, the undersigned held a hearing on the motions. Also pending in this action is Safeskin's motion to seal the deposition transcripts that have been filed in connection with the motions and Safeskin's motion to admit additional exhibits into evidence. For the following reasons, Safeskin's motions to admit additional exhibits into evidence and to seal the deposition transcripts will be granted. It will be recommended that Plaintiffs' motion to withdraw the stipulation of dismissal be denied and that Safeskin's motion to enforce the settlement agreement be granted.

                        I. <u>Procedural History</u>

    The procedural history of this case is as follows. On

February 13, 1998, the instant action was filed by Christine Kraras, Jeffrey Boorstein, Rebecca Boorstein, and Katherine Boorstein against defendants Safeskin Corporation, Johnson & Johnson Medical, Incorporated, and Tillotson Corporation. Ms. Kraras claims that she developed a serious latex allergy from using the latex medical gloves manufactured by these defendants. In April 1998, the Judicial Panel on Multidistrict Litigation ("MDL Panel") consolidated this action with other similar latex cases and transferred it to the United States District Court for the Eastern District of Pennsylvania for coordinated pretrial proceedings. In December 2002, the MDL Panel remanded the case to this Court. On October 7, 2003, Plaintiffs and Safeskin filed a stipulation of dismissal indicating that Plaintiffs' claims against Safeskin had been settled. On April 5, 2004, Plaintiffs filed a motion to withdraw the stipulation of dismissal. Shortly thereafter, Safeskin filed a motion to enforce the settlement agreement.

## II. Statement of Facts

The following statement of facts is taken from the testimony at the July 19, 2004 hearing, the depositions on file, and the exhibits filed and admitted in connection with the hearing.

In November 1997, Ms. Kraras retained attorney Douglas Roberts of the law firm Clark, Perdue, Roberts & Scott to represent Plaintiffs in this matter. In January 2001, with the consent of Plaintiffs, Mr. Roberts sent Plaintiffs' case, along with a number of other latex cases that he was handling, to the law firm of Baron & Budd. See Roberts Depo. at 12-13. Mr. Roberts testified that although he remained counsel of record for Plaintiffs, he was not directly involved in any settlement negotiations with Safeskin. Rather, Baron & Budd took primary responsibility both for litigating and, if appropriate, for negotiating and settling these cases. When, in late 2002 or

early 2003, the subject of settlement with Safeskin arose, Mr. Roberts directed Safeskin's counsel, Robert O'Malley, to deal with the Baron & Budd attorneys regarding negotiation and settlement of the latex cases. See Exh. D-4.

At some point during the month of January 2003, Amy Carter, an attorney with Baron & Budd, contacted Ms. Kraras and recommended that she allow Ellen Presby, another attorney with Baron & Budd, to engage in settlement negotiations with Safeskin on Plaintiffs' behalf. See Exh. P-1. As a result of this conversation with Ms. Carter, Ms. Kraras sent an e-mail to Ms. Presby asking about the ramifications of settlement talks. See id. It is not clear how Ms. Presby responded to this e-mail.

On February 6, 2003, Rebecca Hoffpauir, also with Baron & Budd, sent an e-mail to Pam Thelen, a paralegal at Clark, Perdue, Roberts & Scott. Apparently, the e-mail (which has been redacted) contained settlement figures for other cases, but not the Kraras case. Ms. Hoffpauir stated that "Kraras still hasn't agreed to let us negotiate, so that is why she isn't on this list." See Exh. P-2. Thus, as of February 6, 2003, Ms. Kraras had not agreed to allow Baron & Budd to negotiate with Safeskin on Plaintiffs' behalf.

Apparently, that situation changed in the next ten days. On February 17, 2003, Ms. Presby sent an e-mail to Mr. Roberts explaining the proposed settlement of a number of latex cases. See Exh. P-3. This time, an amount was included for the Kraras case. Ms. Presby asked if Mr. Roberts could get authority from Ms. Kraras to settle Plaintiffs' case at that amount. See id.

Ms. Kraras made several written responses to her attorneys' requests for approval of this settlement. On February 27, 2003, after Ms. Thelen relayed the settlement amount to her, Ms. Kraras asked whether Plaintiffs could dismiss their case without prejudice and re-file it within one year. See Exh. P-7. She

3

also expressed hesitation about taking the settlement and her concern that later a different plaintiff might obtain a large verdict against Safeskin.  Id.

On March 4, 2003, Ms. Kraras sent an e-mail to Mr. Roberts explaining that Ms. Carter had called her and tried to pressure her into settling her case with Safeskin.  See Exh. P-8.  She asked Mr. Roberts if he agreed that settlement is "essentially the only option;" if any other cases were going to trial; what he knew about the trend of adverse verdicts (apparently there had been seven consecutive defense verdicts); if the settlement would be taxable; and, again, if they could dismiss and re-file.  Id. Mr. Roberts asked Ms. Thelen to pass the questions on to someone at Baron & Budd.  She apparently did so the same day, suggesting in her e-mail that, among other things, dismissal and re-filing was not an option because, in federal court, all defendants would have to agree to the dismissal.  Ms. Presby responded that, given the string of defense verdicts and the cost of trial, trial was unlikely; that the trend of adverse verdicts was unlikely to change; and that dismissal with the option of re-filing might pose substantial limitations problems and, in addition, both Baron & Budd and Mr. Roberts might not continue to represent Plaintiffs in a re-filed action.  Two days later, on March 6, 2003, Mr. Roberts recommended to Ms. Kraras that she accept the settlement based on those responses.

After this communication, Ms. Kraras and Mr. Roberts continued to discuss the proposed settlement.  On Friday, March 7, 2003, Ms. Kraras stated that she had been called again by Ms. Carter and asked for a decision that day.  She asked for at least the weekend to consider the offer further.  She then asked Mr. Roberts that if she accepted this "horrendous deal," whether she recalled correctly that attorney fees and expenses would not exceed 50 percent and that the settlement would not be taxed.

4

<u>See</u> Exh. D-17, p. 00034.  Mr. Roberts responded on Monday, March 10, 2003 that the settlement was exempt from taxation and that she would receive a minimum of 50 percent of the settlement amount.  <u>See</u> Exh. D-18, p. 000332-34.  Mr. Roberts's time records contain no further entries concerning this case until January 14, 2004.

On March 11, 2003, Ms. Carter sent an e-mail to Mr. O'Malley indicating that the plaintiffs in all twelve cases, including the Kraras plaintiffs, had accepted Safeskin's settlement offer.  <u>See</u> Exh. D-5.  Also on March 11, 2003, Ms. Presby mailed a letter to Mr. O'Malley, with an e-mail copy to Mr. Roberts (which he does not remember receiving), confirming the settlement of the Kraras case.  <u>See</u> Exh. D-6.  Ms. Carter testified that she received authority to accept Safeskin's offer directly from Ms. Kraras on March 11, 2003.  <u>See</u> Carter Depo. at 63.  Ms. Presby testified that Ms. Carter told her that Ms. Kraras had accepted the settlement.  <u>See</u> Presby Depo. at 30.  Both Ms. Kraras and her husband, plaintiff Jeffrey Boorstein, adamantly denied that this had occurred.

Notwithstanding the apparent settlement of this case, Ms. Carter asked Mr. Roberts on March 25, 2003 if he could give her the "rule" that would have allowed Ms. Kraras to dismiss her case and re-file it within a year.  On March 29, 2003, Mr. Roberts forwarded an e-mail to Ms. Presby and Ms. Kraras explaining the operation of the Ohio savings statute.  <u>See</u> Exh. P-10.  That memorandum made no mention of the problem identified earlier, i.e., that the defendants in a federal court action would have to agree to dismissal.  On June 19, 2003, an attorney with Safeskin sent a letter via e-mail to Baron & Budd with the settlement release for the Kraras case.  <u>See</u> Exh. D-9.  On September 5, 2003, Ms. Carter e-mailed Mr. O'Malley confirming the terms of the settlement agreement, including the Kraras case, and

reserving the right to enforce the settlement agreement if Safeskin refused to pay the settlement amounts upon its receipt of the releases. See Exh. D-10. On September 23, 2003, Amanda Boley, a paralegal from Baron & Budd, mailed a letter to Ms. Kraras stating that "as you are aware, a settlement agreement with [Safeskin] has been reached" and requesting that Plaintiffs execute the release. See Exh. D-11.

On October 7, 2003, Plaintiffs and Safeskin filed a stipulation of dismissal of Plaintiffs' claims against Safeskin. On October 29, 2003, Ms. Boley made a note for Mr. Roberts's file that Ms. Kraras had said that she and her husband would sign the release if they could dismiss their children as parties to the action. See Exh. D-14. Ms. Kraras denies having that conversation or making that statement. On November 24, 2003, Ms. Thelen e-mailed Ms. Boley stating that Ms. Kraras would not sign her release and that Ms. Kraras wanted to talk with an attorney in Massachusetts who had just won a judgment for a plaintiff in a latex case. See Exh. P-12. As of the date of the hearing, Plaintiffs have not signed the release. It is on the basis of these facts that the instant motions will be decided.

### III. Preliminary Issues

On August 4, 2004, Safeskin filed a motion to admit additional exhibits into evidence. During the evidentiary hearing, the Court reserved a ruling on the question of whether to admit Exhibits D-16 through D-18.

Safeskin explains that Exhibits D-16 through D-18 are the complete document productions from Baron & Budd; Clark, Perdue, Roberts & Scott; and Plaintiffs, respectively. Safeskin offers this evidence to refute Ms. Presby's deposition testimony that there exist documents showing that Mr. O'Malley knew that the parties had not reached a final settlement. Plaintiffs objected generally to introducing, in wholesale fashion, all of these

6

documents.

The Court concludes that Ms. Presby's deposition statement concerning Mr. O'Malley's "knowledge" about whether there was a valid and binding settlement agreement between Plaintiffs and Safeskin may be an issue, especially if it relates to the pending sanctions motion. Therefore, these exhibits will be admitted for the limited purpose of refuting the claim that Mr. O'Malley knew there was not a final settlement. The Court will also consider, for all purposes, those portions of Exhibit D-17 about which Mr. Roberts was questioned.

## IV. Discussion

A federal court has inherent authority to enforce agreements in settlement of litigation before it. See Therma-Scan, Inc. v. Thermoscan, Inc., 217 F.3d 414, 419 (6th Cir. 2000). The party relying on the settlement agreement has the burden of proving its validity by clear and convincing evidence. See Huffer v. Herman, 168 F.Supp.2d 815, 823 (S.D. Ohio 2001).

In support of the motion to withdraw the stipulation of dismissal, Plaintiffs contend that Ms. Kraras never gave Ms. Carter or any attorney authority to settle her case with Safeskin. Plaintiffs further contend that Safeskin conditioned the settlement upon the receipt of releases from the plaintiffs in all twelve latex cases. Consequently, because Safeskin has not received releases from the Kraras plaintiffs, which Plaintiffs characterize as a "condition precedent," there is not a binding settlement.

By contrast, in support of its motion to enforce the settlement agreement, Safeskin contends that Ms. Kraras was aware of and authorized the settlement negotiations. Further, Safeskin claims that Ms. Kraras expressly authorized acceptance of the settlement amount. Safeskin also contends that even if Ms. Kraras did not authorize settlement, the settlement should be

7

upheld because Baron & Budd had apparent authority to settle Plaintiffs' claims against Safeskin. Thus, Safeskin argues, the settlement is valid and binding.

        A. <u>Plaintiffs' Condition Precedent Argument</u>

One of Plaintiffs' arguments is that there is not a binding settlement agreement because settlement was conditioned upon Mr. O'Malley's receipt of releases, on behalf of Safeskin, from all the plaintiffs. They claim that because Safeskin has not received releases from the Kraras plaintiffs, there is no settlement.

This argument is completely meritless. Safeskin's duty to pay the settlement amount, and not the settlement itself, was conditioned on the receipt of releases. In fact, in a letter from Ms. Carter to Mr. O'Malley, Ms. Carter noted that the plaintiffs reserved the right to "institute an action to enforce the terms of the settlement." Exh. D-10. This letter was mailed before all the releases were signed, evidencing Plaintiffs' understanding that there was a binding settlement agreement based upon Safeskin's offer to Plaintiffs (and others), and the acceptance of that offer by Ms. Presby's March 11, 2003 letter.

It would be extremely unusual for parties to negotiate an agreement that was expressly conditioned upon the performance of an act by one of the parties, such as the execution of a release. Such an agreement would give the party who was to execute the release the complete discretion to void the agreement by simply not signing the release, making the entire agreement largely (if not completely) illusory. In the absence of any evidence that the parties intended such an unusual arrangement, the Court will not infer such an intent. Cf. <u>Poole v. Becker Motor Sales, Inc.</u>, No. 17833, 1999 WL 1062241 (Montgomery Co. Ct. App. Nov. 24, 1999)(enforcing an oral settlement agreement by giving effect to the parties' agreement that the plaintiff would release all

claims against the defendant).

### B. Was A Settlement Reached?

Before reaching the question of whether a settlement was reached, the first issue before the Court is the question of which state's law should be applied to the question of whether Baron & Budd had authority to settle Plaintiffs' claims against Safeskin and bind Plaintiffs to that agreement. The parties have not briefed this issue but instead have simply relied on Ohio law. The law firm of Baron & Budd is located in Texas. Plaintiffs are citizens of Ohio. The action was pending in Pennsylvania when Plaintiffs retained the Baron & Budd attorneys. Because this action is before the Court on the basis of diversity jurisdiction, the Court is obligated to apply the choice of law rules of the forum state. Thus, Ohio's choice of law rules apply. See Russell v. GTE Government Systems Corp., 232 F.Supp.2d 840, 848 (S.D. Ohio 2002).

Ohio has adopted the Restatement (Second) of Conflict of Laws. See Morgan v. Biro Mfg. Co., Inc., 15 Ohio St.3d 339, 341-42 (1984). Under the Restatement, "when the parties have failed to specify which state's substantive law should govern the contract . . ., the court should determine which state has the most significant relationship to the transaction and the parties." Russell, 232 F.Supp.2d at 848 (internal quotation marks omitted). To make this determination, the court should consider: "(1) the place of contracting, (2) the place of negotiation, (3) the place of performance, (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties." Id. at 849 (citing the Restatement (Second) of Conflict of Laws §188).

It is somewhat unclear how the above factors apply to the question of the relationship between an in-state client and an

out-of-state attorney relating to litigation that was pending in yet a third state when the attorney was retained.  However, review of Ohio's law, Texas's law, and Pennsylvania's law on the issue of an attorney's authority to settle a client's case reveals that each state has adopted a similar approach.  The Court is satisfied that the application of each state's approach leads to the same result.  Consequently, the Court will rely on Ohio law in the following discussion.

The parties do not dispute that there was an attorney-client relationship between Plaintiffs and Baron & Budd.  The parties also do not dispute that on March 11, 2003, both Ms. Carter and Ms. Presby communicated to Safeskin's attorney, Mr. O'Malley, that the Kraras case was settled.  Thus, the only issue before the Court is whether Baron & Budd had authority to settle Plaintiffs' claims against Safeskin and bind Plaintiffs to that agreement.

The leading case in Ohio on the issue of an attorney's authority to settle a client's claims holds that "[a]n attorney who is without special authorization has no implied or apparent authority, solely by virtue of his general retainer, to compromise and settle his client's claim or cause of action." Morr v. Crouch, 19 Ohio St.2d 24, syllabus ¶2 (1969); see also Southwestern Bell Tel. Co. v. Vidrine, 610 S.W.2d 803, 805 (Tex. Civ. App. 1980)(holding that "mere employment of counsel does not clothe the counsel with authority to settle the cause without the specific consent of the client"); Bennett v. Juzelenos, 791 A.2d 403, 408 (Pa. Super. Ct. 2002)(holding that "[t]he ordinary employment of an attorney to represent a client with respect to litigation does not confer upon the attorney the implied or apparent authority to bind the client to a settlement or compromise, and the attorney cannot do so in the absence of express authority").

10

The authority to negotiate and settle a client's claim "need not be express, but may be ascertained from the surrounding circumstances." Elliott v. General Motors Corp., 72 Ohio App.3d 486, 488 (Marion Co. 1991). In fact, "[b]ut for this rule, prudent litigants could not rely on opposing counsel's representation of authorization to settle. Fear of a later claim that counsel lacked authority to settle would require litigants to go behind counsel to the opposing party in order to verify authorization for every settlement offer." Capital Dredge & Dock Corp. v. City of Detroit, 800 F.2d 525, 531 (6th Cir. 1986).

If an attorney settles a client's claims without having been given authority to negotiate a settlement, that settlement is not enforceable. See Morr, 19 Ohio St.2d at 29. However, if an attorney is given authority to negotiate a settlement, but settles the client's claims on terms unacceptable to the client, such a settlement is enforceable, nevertheless. See Argo Plastic Products Co. v. City of Cleveland, 15 Ohio St.3d 389, 392 (1984)(explaining that a $500,000 settlement was enforceable against the city because the city's attorney had authority to negotiate the city's claims even though the city had authorized only a $2,500 settlement). In these circumstances, the client's remedy, if dissatisfied, is an action against the client's attorney for professional malpractice. See id.

One of Safeskin's arguments is that Baron & Budd had apparent authority to settle Plaintiffs' claims. However, the facts do not demonstrate that Baron & Budd had apparent authority to settle Plaintiffs' claims. "Apparent authority can . . . be created only by the principal's manifestations to a third party. The agent's representations of authority to a third person, standing alone, are insufficient to create apparent authority in the agent to act for the principal." Central States Southeast and Southwest Areas Pension Fund v. Kraftco, Inc., 799 F.2d 1098,

11

1113 (6th Cir. 1986); see also Master Consolidated Corp. v. BancOhio Natl. Bank, 61 Ohio St.3d 570, syllabus (1991). There is no evidence that Plaintiffs manifested to Safeskin's attorneys that Baron & Budd had authority to settle their claims. The only manifestation by Plaintiffs of which Safeskin was aware is their retention of Baron & Budd. As explained above, this is insufficient to confer authority to settle their claims. See Morr, 19 Ohio St.2d at syllabus ¶2.

The Court now turns to the parties' main argument, which is whether Baron & Budd had actual authority to settle Plaintiffs' claims. To determine whether an agent had actual authority, a court looks to the principal's manifestations to the agent. See Master Consolidated Corp., 61 Ohio St.3d at 575.

At the hearing, Ms. Kraras testified that Baron & Budd knew that she did not want to settle her case, but wanted to take it to trial. She claimed that she never gave Amy Carter or any other attorney authority to settle Plaintiffs' claims against Safeskin. She explained that the settlement amount offered by Safeskin was entirely inadequate to compensate her and her family for her injuries. Therefore, she did not authorize Ms. Carter to accept the offered amount in settlement of Plaintiffs' claims against Safeskin. Her husband, plaintiff Jeffrey Boorstein, testified similarly at the hearing.

Although Ms. Kraras testified that she never wanted to settle her claims, there is evidence in the record that Plaintiffs, at least at one point, considered settling. In her March 4, 2003 e-mail to Mr. Roberts, Ms. Kraras asked questions about the settlement offer, including whether a settlement recovery would be taxable. See Exh. P-8. Her further communications with Mr. Roberts, including questions about her share of the settlement and her request for his recommendation about whether she should settle, show that, at least between

March 7, 2003 and March 10, 2003, she was seriously debating whether she should accept Safeskin's offer, which her attorneys were advising her was essentially her only option.

The Baron & Budd attorneys unequivocally understood that they had been given specific authority to settle Plaintiffs' claims on the terms offered by Safeskin.  Ms. Carter testified that she has "an independent recollection of having conversations with Christine [Kraras] that ended in a conversation where she gave me authority to settle with Safeskin."  Carter Depo. at 67-68.  Ms. Carter stated that she believed that Ms. Kraras had given her authority to settle on March 11, 2003.  See id. at 62.  On March 29, 2003, Ms. Carter e-mailed Ms. Thelen confirming that Ms. Kraras had given Baron & Budd authority to settle her claims.  See Exh. D-15.  Ms. Presby stated that she recalled that sometime around March 11, 2003, Ms. Carter had told her that Ms. Kraras had given her authority to settle Plaintiffs' claims.  See Presby Depo. at 29.  Ms. Presby further stated that she would not have mailed the March 11, 2003 letter to Mr. O'Malley confirming that the twelve latex cases were settled, including the Kraras case, unless all plaintiffs had agreed to participate in the settlement.  See id. at 34.

Next, the Court notes the curious void in Mr. Roberts's records regarding Plaintiffs' case.  Plaintiffs remained Mr. Roberts's clients while Baron & Budd handled the settlement negotiations.  On March 5, 2003, Mr. Roberts was told that Safeskin would withdraw its settlement offer if Plaintiffs did not accept it by the next day.  See Exh. P-9.  He and Ms. Kraras had numerous communications over the next few days during which he answered her questions, added his recommendation to that of Ms. Carter concerning the advisability of the settlement, and learned that the deadline had been pushed back to at least March 10.  Whether Ms. Kraras agreed to the deal being offered by

13

Safeskin was material not only to her case, but to the cases of eleven other of Mr. Roberts's clients. Although he has no record or recollection of receiving Ms. Presby's letter of March 11, 2003 advising Mr. O'Malley that all twelve cases had settled - a letter sent to his correct e-mail address - he appears to have made no inquiry after March 10, 2003 about whether the cases settled, and made no time entries in Ms. Kraras's file until January 2004.

On March 29, 2003, Mr. Roberts did send an e-mail to Ms. Presby forwarding research done by Glen Pritchard of his office about whether the Kraras case could be dismissed without prejudice and re-filed later. See Exh. P-10. He did so in response to an e-mail from Ms. Carter. Although it is unclear why Ms. Carter asked for that information, it does not necessarily mean that she harbored doubts about the fact of settlement. On balance, the Court concludes that this e-mail is not persuasive evidence on the question of whether on March 11, 2003 Baron & Budd had authority to settle and did settle Plaintiffs' claims against Safeskin.

Finally, the Court concludes that, after review of Exhibits D-16 through D-18, there is no evidence that Mr. O'Malley knew that there was not a final settlement on Plaintiffs' claims against Safeskin. Rather, he was clearly told by Ms. Presby that the case had settled, and knew only that there was some difficulty getting the plaintiffs to sign the releases so a check could be issued.

Under the case law, there are two different factual issues to be resolved, either one of which can lead to the conclusion that an enforceable settlement agreement was reached. The first question is whether there is evidence of something beyond a bare retainer to indicate that Baron & Budd had authority to negotiate a settlement on Plaintiffs' behalf. The answer to that question

14

is yes.  Baron & Budd specifically sought Plaintiffs' authority to negotiate on their behalf.  In early February 2003, Baron & Budd acknowledged that such authority had not yet been given.  However, by February 17, 2003, Baron & Budd had obtained a settlement figure for the Kraras case - something the firm had expressed reluctance to do until authority was given.  Ms. Kraras's responses to the settlement offer did not include any indication that Baron & Budd had not been authorized to broach the subject of settlement with Safeskin, but were focused entirely upon the advisability of accepting the offer that had been made.  Under those circumstances, the Court finds by clear and convincing evidence that Ms. Kraras not only retained Baron & Budd but authorized that firm to enter into settlement negotiations.  Once she did so, Baron & Budd had authority to bind her to a specific sum even if she did not agree to that settlement.  See <u>Argo Plastic Products</u>, 15 Ohio St.3d at 392.

A second, and independent, issue is whether Ms. Kraras expressly authorized Baron & Budd to accept the specific amount offered.  All outward indications are that she did.  Ms. Carter, an experienced litigator, specifically recalled consent being given.  She told Ms. Presby that Ms. Kraras had accepted the offer.  Ms. Presby confirmed the settlement in writing to both Mr. O'Malley and Mr. Roberts.  On March 10, 2003, Mr. Roberts ceased working on the Kraras case and made no further inquiries about whether this case (or the eleven others) had settled.  Releases were prepared and sent.  It was not until much later - and after Ms. Kraras learned that a latex case had been won by another plaintiff - that she unequivocally denied having settled the case.

Ms. Kraras may believe to this day that she did not accept Safeskin's offer.  However, the evidence is compelling that she said something in her March 11, 2003 conversation with Ms. Carter

15

that reasonably led Ms. Carter to conclude the opposite. The Court does not believe that Ms. Carter would have fabricated her testimony about this conversation, or chosen falsely to communicate to Ms. Presby that Ms. Kraras had accepted the offer. The benefit to her, personally, from doing so, and settling twelve cases for the amount at issue here, would have been negligible. The downside - a potential malpractice suit, disciplinary proceedings, even loss of employment - would have been significant. Looking at all the evidence, the Court is persuaded by the requisite quantum of proof that Ms. Kraras did authorize Ms. Carter to accept Safeskin's offer, even if Ms. Kraras had serious reservations about it at the time. Ms. Kraras's subsequent conduct is strong evidence of regret, but not that an agreement had not been reached on March 11, 2003. See Echols v. Williams, 267 F.Supp.2d 865, 867 (S.D. Ohio 2003) (explaining that "a settlement agreement is a contract, and as such, is enforceable under contract law principles. There is no basis to rescind a contract in the mere emotional regret of having agreed to its terms").

## V. Other Matters

On July 16, 2004, Safeskin filed a motion to seal the deposition transcripts of Ms. Carter, Mr. Roberts, Ms. Thelen, and Ms. Presby. Safeskin claims that these transcripts "contain confidential terms related to the settlement of Plaintiffs' claims." Motion To Retroactively Seal Expedited Deposition Transcripts at 1.

In determining whether to seal portions of the court record, a court must balance the public's First Amendment right of access to court records with a party's privacy concerns. See United States v. Criden, 648 F.2d 814, 823 (3rd Cir. 1981). In so doing, the Court must determine whether the party seeking to seal the record has established good cause. See Haber v. Evans, 268

16

F.Supp.2d 507, 510 (E.D. Pa. 2003). A court may consider a number of factors in determining whether a party's privacy interests outweigh the public's right of access including:

> (1) the need for public access to the documents at issue; (2) the extent to which the public had access to the documents prior to the sealing order; (3) the fact that a party has objected to disclosure and the identity of that party; (4) the strength of the property and privacy interests involved; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced.

Applying these factors to the instant motion to seal, the Court concludes that Safeskin has established good cause to seal the deposition transcripts. The transcripts contain confidential terms regarding the settlement of Plaintiffs' claims and were introduced for the purpose of establishing that Plaintiffs' claims against Safeskin were in fact settled. Therefore, Safeskin's motion to seal the transcripts will be granted. See, e.g., United States v. Glens Falls Newspapers, Inc., 160 F.3d 853, 857 (2nd Cir. 1998) (holding that there is no presumptive right of access to settlement discussions and documents).

## VI. Conclusion

Based on the foregoing, Safeskin's motions to admit additional exhibits into evidence (file doc. #75) and to seal the deposition transcripts (file doc. #72) are GRANTED.

It is recommended that Plaintiffs' motion to withdraw the stipulation of dismissal (file doc. #18) be denied. It is recommended that Safeskin's motion to enforce the settlement agreement (file docs. #19 & 63) be granted.

If any party objects to the Order granting Safeskin's motion to admit additional exhibits and motion to seal the deposition transcripts, that party may, within ten (10) days after this Order is filed, file and serve on the opposing party a motion for

reconsideration by a District Judge.  28 U.S.C. §636(b)(1)(A), Rule 72(a), Fed. R. Civ. P.; Eastern Division Order No. 91-3, pt. I., F., 5.  The motion must specifically designate the order or part in question and the basis for any objection.  Responses to objections are due ten days after objections are filed and replies by the objecting party are due seven days thereafter.  The District Judge, upon consideration of the motion, shall set aside any part of this Order found to be clearly erroneous or contrary to law.

The order on the motion to admit additional exhibits and motion to seal the deposition transcripts is in full force and effect, notwithstanding the filing of any objections, unless stayed by the Magistrate Judge or District Judge.  S.D. Ohio L.R. 72.4.

If any party objects to the Report and Recommendation concerning Plaintiffs' motion to withdraw the stipulation of dismissal and Safeskin's motion to enforce the settlement agreement, that party may, within ten (10) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. Section 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation concerning the motion to withdraw the stipulation of dismissal and the motion to enforce

18

the settlement agreement will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

                              /s/Terence P. Kemp
                          United States Magistrate Judge