UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Christine M. Kraras, *et al.*,

    Plaintiffs,

v.

Safeskin Corporation, *et al.*,

    Defendants.

Case No. 2:98cv169

Judge Michael H. Watson

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Before the Court is the August 26, 2004 Magistrate Judge's Report and Recommendation ("R&R"). (Doc. 77)  The Magistrate recommends that this Court deny Plaintiffs' Motion to Withdraw the Stipulation of Dismissal (Doc. 18) and grant Defendants' Motion to Enforce the Settlement Agreement.  (Doc. 19 & 63)

The parties were given proper notice, pursuant to 28 U.S.C. § 636(b)(1)(C), including notice that the parties would waive further appeal if they failed to file objections to the R&R in a timely manner.  See *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).  Plaintiffs filed Objections to the August 26, 2004 Magistrate Judge's R&R.  (Doc. 78)  Defendants filed a Response to Plaintiffs' Objections.  (Doc. 79)

Upon *de novo* review of this matter, pursuant to 28 U.S.C. § 636, the Court finds no error in the Magistrate Judge's Report and Recommendation; and hereby adopts the August 26, 2004 Magistrate Judge's Report and Recommendation.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**

This case arises out of Dr. Christine Kraras' claim that she developed a serious latex allergy from using the latex medical gloves manufactured by Defendants. Dr. Kraras' husband, Jeffrey Boorstein, and her children, Rebecca and Katherine Boorstein, are Plaintiffs along with Dr. Kraras.

The Magistrate received evidence during a July 19, 2004 hearing, as well as depositions and exhibits filed and admitted in connection with the hearing. The following detailed review of the evidence in the record demonstrates that there was no error in the Magistrate's factual findings.

In November of 1997, Dr. Kraras retained Douglas Roberts of the firm Clark, Perdue, Roberts & Scott to represent Plaintiffs. Dr. Kraras' case, along with thirty-eight other latex cases, were transferred to the firm of Baron & Budd. A letter dated November 19, 2001 from Baron & Budd to Roberts confirms this arrangement. (Defendant's Hearing Ex. 1) The letter states that Baron & Budd "will handle these cases, including the continued work-up of these cases for trial and/or settlement purposes." (Id.)

In an email exchange on October 14, 2002, Robert O'Malley, who represents Safeskin in this matter, asked Ellen Presby, an attorney with Baron & Budd: "Just so we're clear, Baron + Budd (you) now have authority from Clark, Purdue and it's [sic] latex clients to negotiate and finalize settlements with Safeskin, correct?" (Defendant's Hearing Ex. 2) Presby replied: "I have authority to negotiate for Doug Roberts'." (Id.) Attached to the email is a document from Presby showing the demand amounts for each of the cases. (Presby Depo. Ex. 2) A demand for Dr. Kraras is included on that list. (Id.)

2

On November 6, 2002, Roberts' database for the Kraras case shows that he talked to Presby about the Safeskin demands. (Roberts Depo. Ex. 1, at 18) Regarding Kraras, Roberts states: "I have a call into the doctor re our demand; I really need to talk to her to see what she wants us to do." (Id.) In another note in the database made on November 7, 2002, Roberts states that Dr. Kraras will call next week because she needs to talk to her husband about the settlement offers. (Id. at 20) Roberts stated that he explained to Dr. Kraras that things were not going well for the plaintiffs and that the offers were based on risk, not actual damages. (Id.) It appears that Roberts then relayed this information to Presby via email on the same day. (Id.) Roberts told Presby: "For the moment, let's omit her from the group." (Id. at 21) Presby responded: "No problem." (Id.) On that same day, Presby emailed a revised demand for the Roberts cases to O'Malley. (Id. at 23) O'Malley responded to the email, asking "what does 'offer withdrawn' for the Kraras case mean?" (Id.)

In an email dated December 4, 2002, Presby asked Roberts: "Any chance Kraras is ready to make a demand??" (Roberts Depo. Ex. B, 2) Roberts replied that same day: "Christine called yesterday and said that given the values that we were talking about, she was not interested in making a demand." (Id.)

In an email dated January 27, 2003, O'Malley asked Presby: "To confirm, Kraras has now authorized settlement talks, and is included?" (Defendant's Hearing Ex. 3)

On February 6, 2003, Hoffpauir emailed Pam Thelen, a paralegal at Clark, Perdue, Roberts & Scott, and asked her if she could call clients to get authority for the listed amounts. (Roberts Depo., Ex. 1, at 45) Hoffpauir explained: "Of course Kraras still hasn't agreed to let us negotiate, so that is why she isn't on this list." (Id.)

3

Therefore, the evidence in the record supports the Magistrate's finding that as of February 6, 2003, Kraras had not agreed to allow Baron & Budd to negotiate with Safeskin on her behalf. However, as the Magistrate noted, the situation changed soon thereafter. In a letter dated February 10, 2003, Roberts wrote to O'Malley: "Per your request, Baron & Budd have the authority to negotiate and settle all of the CPR&S latex cases." (Defendant's Hearing Ex. 4)

On February 17, 2003, Presby emailed Roberts with a list of the allocation of the total settlement amount with Safeskin. (Id. at 47) Dr. Kraras' name is included along with an amount on that list. (Id.) Presby asked Roberts if he thought the allocation was appropriate and if he could get authority. (Id.)

On February 20, 2003, Thelen emailed Presby and Roberts stating:

> I know Ellen has authority to talk with Christine. She may have questions about proceeding to trial etc. It might be better of [sic] either Ellen or Doug called her!!!"

(Roberts Depo., Ex. 1, at 48) On February 25, 2003, Thelen emailed Carter: " I still don't know if someone from your office is going to talk to Dr. Kraras?????????" (Id. at 50) Carter then asked Thelen to try Dr. Kraras first. (Id.) Thelen responded that she could try to call Dr. Kraras tomorrow, but that Thelen thought it would be best if an attorney talked with her because Dr. Kraras will have questions and will wonder about proceeding to trial. (Id.) Carter responded:

> You try her first. Then when she has all those questions, Ellen or I will call her. That way she knows that both offices are behind her taking the money.

(Id.)

4

On February 27, 2003, Hoffpauir emailed Thelen asking who had not yet accepted their offer from Safeskin. (Id. at 53) Hoffpauir stated that her record showed that Dr. Kraras had not accepted the offer from Safeskin. (Id.)

An email from Thelen to Roberts, Presby, and Carter shows that Thelen relayed the offer to Dr. Kraras. Thelen stated:

> She wasn't excited at all. She would hate to settle for no money and then later on, somebody get a big verdict. She wondered about the possibility of dismissing and refiling in a year.

(Roberts Depo. Ex. 1, at 54) Roberts replied the next day to Thelen, stating that in federal court you cannot dismiss without leave of all of the defendants and there is "little chance of that happening." (Id.)

On March 4, 2003, Dr. Kraras sent an email to Roberts stating that Carter had called her the previous day and continued to pressure her to take the Safeskin settlement. (Roberts Depo.Ex. 1, at 32) Dr. Kraras stated that she needed "clarification and explanation on some important issues before I can make a decision as to where to go with my case." (Id.) Dr. Kraras explained:

> Before seriously considering this minimal offer, it would be helpful for me to know the following:
>
> 1. At this point, do you agree with the Baron & Budd lawyers that settlement is essentially the only option? If so, why?
>
> 2. Can you tell me what is happening with the balance of the cases in the MDL, aside from those belonging to you and B & B? Amy said another trial just finished 2 weeks ago, so perhaps some plaintiffs are not just settling, but are proceeding to trial. Are there some plaintiff' firms that are still going ahead with some of their cases? Could we talk with another firm?
>
> 3. Amy said this recent trial resulted in a defense verdict, now standing at 7 in a row according to her. What happened to the early verdicts in favor of the plaintiffs? Were they upheld? Is there any chance this trend will change?

5

    4. Will the settlement be taxed?

    5. Would it be possible to dismiss without prejudice with the right to refile in one year? Would we have difficulty re-filing? Would there be any benefit to doing this just in case there are some successful plaintiffs in the meantime?

(Id. at 33) This email was forwarded onto Presby and Rebecca Hoffpauir of Baron & Budd with comments from Roberts. (Id. at 32) One of Roberts' comments was that "you cannot dismiss in Federal Court without leave of the defendants." (Id.) Presby then commented: "The cost of trial coupled with the likelihood of a defense verdict makes trial unlikely." (Id. at 31) Presby also commented that she did not know the answer regarding dismissing and refiling, and "would defer to Doug." (Id.) Presby stated: "It would seem there would be a substantial statute of limitations problem." (Id.) This exchange was then forwarded to Kraras on March 6, 2003, with the following opening statement from Roberts:

> Talked to Amy Carter; she is convinced that this is the best that we are going to get and that you should take the settlement. We have had seven trials in a row now where the defendants have won. She says that the latex litigation has generally gone south and that we should call it quits.
>
> Since they are the people in the know right now, I am willing to make that recommendation, hard as it is for both of us.

(Id.)

On March 7, 2003, Dr. Kraras emailed Roberts, thanking him for his quick response.

(Id. at 34) Dr. Kraras stated:

> Amy Carter just called me again asking me to make a decision today. I asked her to try to put the defendants off until Monday, but she was not confident she could do it.

(Id.) Kraras had more questions, which Roberts answered by email on March 10, 2003.

(Id. at 33)

On March 10, 2003 at 12:24 p.m., Carter sent an email to Thelen and Hoffpauir with a subject line "kraras" and asked "I need to know who is left in this case! So far, I've figured out . . . Safeskin." (Id. at 58)

Also on March 10, 2003 at 5:50 p.m., O'Malley sent an email with the subject line "settlements" and asked: "Amy - What's status?"[1] On March 11, 2003 at 8:11 a.m., Carter responded:

> Everyone has accepted. Please send me a confirmation letter. We should talk about releases this week. I'm in the office until this afternoon and will be back Friday.

(Defendant's Hearing Ex. 5)[2] That same day at 2:54 p.m., Hoffpauir emailed a confirmation letter from Presby to O'Malley. (Defendant's Hearing Ex. 6) This email was copied to Presby and Roberts. (Id.)[3] The letter is dated March 11, 2003 and states:

> This letter will confirm our agreement to settle the following cases:
> . . .
> 4. Christine Kraras     $ [redacted]

(Id.) On March 14, 2003, O'Malley emailed Hoffpauir, Presby, and Roberts and notified them that the settlement amounts were not correct. (Defendant's Hearing Ex. 7) Presby responded the same day, informing O'Malley and the others: "We'll get that taken care of."

---

[1] It is not clear from the print out of these emails from O'Malley if these times are Central time. O'Malley's firm is located in Chicago, Illinois.

[2] Carter testified that she remembers having a conversation with Dr. Kraras where she agreed to settle her claim with Safeskin. (Carter Depo. at 63) Carter also recalls that she immediately communicated to Robert O'Malley that everyone had accepted after Kraras gave her authority. (Id.)

[3] Roberts does not recall receiving this communication or this letter. (Roberts Depo. at 28-29) Roberts testified that he does not "have any knowledge that it ever settled. There wasn't any information that I got from Christine indicating that." (Id.)

7

(Id.) At 4:50 p.m. that day, Hoffpauir emailed another settlement confirmation letter to O'Malley, Presby, Carter, and Adrian Moore Chavez. (Defendant's Hearing Ex. 8) The letter is dated March 13, 2003 and states:

> This letter will confirm our agreement to settle the following cases:
> . . .
> 4.   Christine Kraras     $ [redacted]

(Id.) An "E case report" from Baron & Budd entitled "Release Tracking" shows that Dr. Kraras' case against Safeskin was settled on March 13, 2003. (Carter Depo. Ex. H)

Nevertheless, on March 25, 2003, Carter sent an email to Roberts asking: "Doug, Can you give me the rule that allows Kraras to drop her case and re-file within a year?" (Roberts Depo. Ex E, 2) That same day, Roberts forwarded the email to Glen Pritchard in his office, asking whether the savings statute applied to federal actions. (Id.) Pritchard responded to Roberts the next day, citing caselaw on the Ohio savings statute, and concluding: "Based on this, it certainly appears that we could use the savings statute to refile the case in the Ohio state court, and I am 96.7% confident that it could be refiled in federal court too." (Id.) Roberts then forwarded this email to Presby and Kraras on March 29, 2003, stating "it appears that Kraras could be dismissed and refiled within one year of the dismissal." (Id.) As the Magistrate noted, in this email exchange there is no mention of the problem identified earlier - that the defendants would have to agree to dismissal.

Plaintiffs argue that the fact that Plaintiffs' attorneys were researching the possibility of dismissal demonstrates that there was no settlement agreement. However, other evidence in the record indicates that Kraras had accepted Safeskin's settlement offer.

8

On June 9, 2003, Rebecca Hoffpauir of Baron & Budd emailed Pam Thelen in Roberts office informing her that the Safeskin releases had not been sent out yet, but that they would be sent to certain plaintiffs, including Dr. Kraras. (Roberts Depo. Ex. F)

On June 19, 2003, Zora Shaw from O'Malley's firm emailed three releases to Hoffpauir, O'Malley and Carter. (Defendant's Hearing Ex. 9) Included in these releases is a release for Dr. Kraras. (Id.) The release includes a signature line for Dr. Kraras, her husband, and two lines for Dr. Kraras to sign on behalf of her children. (Id.)

In a letter dated September 5, 2003, Carter wrote to O'Malley:

> . . .
> Re: Christine Kraras, M.D. v. Safeskin Corporation
>
> Dear Mr. O'Malley:
>
> This will serve to confirm the terms of the settlement agreement. Pursuant to that agreement, Safeskin Corporation will make payments on all the cases in the settlement group within 14 days after its receipt of all Releases for all the cases in the group. Each Release shall be properly executed by the Plaintiff(s) and/or legal guardians, etc. where applicable. In addition, the parties further agree that Plaintiffs may institute an action to enforce the terms of the settlement.
> . . .

(Defendant's Hearing Ex. 10)

In a letter dated September 23, 2003, Amanda Boley, a legal assistant from Baron & Budd, wrote to Dr. Kraras:

> I am writing to update you on the status of your settlement agreement in your latex litigation case against Safeskin Corporation. As you are aware, a settlement agreement with this defendant has been reached. At this point, most releases have been sent out to the clients. If a release has been sent to you, please execute it, have it notarized, and send it back to me as soon as possible so that we may finish the necessary steps and you can receive your money. If you have misplaced your release, please call me and I will forward another one to you.

9

(Defendant's Hearing Ex. 11) The "E case report" from Baron & Budd entitled "Release Tracking" shows that a release was sent to Dr. Kraras on September 25, 2003. (Carter Depo. Ex. H) On September 30, 2003, Boley entered an electronic note:

> I spoke with Ms. Kraras about the status of her case. I let her know that I sent her Safeskin release to her last Thursday and she should be receiving it shortly. Alos [sic], Ms. Kraras gave us her new adress [sic] and it has been changed in ecase.

(Roberts Depo. Ex. 1, at 13)

On October 29, 2003, Boley entered an electronic note for Dr. Kraras' case stating:

> Dr. Kraras wants to dismiss her kids from the suit. She said her husband and herself will sign the release for Safeskin, but not for the kids. I will email Bob O Malley [sic] and Amy and see what they say.

(Defendant's Hearing Ex. 14)

On October 7, 2003, Plaintiffs and Safeskin filed a Stipulation of Dismissal, indicating that Plaintiffs' claims against Safeskin had been settled. (Doc. 12) Carter testified that Roberts authorized her to sign his name to the stipulation. (Carter Depo. at 21) Roberts testified that he was unable to recall whether Carter asked for permission to sign his name to the stipulation. (Roberts Depo. at 41)

The first indication that there was a problem with the settlement appears on November 24, 2003, when Thelen emailed Boley explaining that Dr. Kraras was not going to sign her release. (Roberts Depo. Ex. 1, at 67) Thelen explained that Dr. Kraras was talking to an attorney who recently got a judgment for $150,000. On April 5, 2004, Plaintiffs filed a motion to withdraw the stipulation of dismissal. (Doc. 18) Defendants then filed a Motion to Enforce the Settlement Agreement. (Doc. 19, 64)

## II. OBJECTIONS TO THE R&R

Plaintiffs object to the Magistrate's recommendation that this Court deny their Motion to Withdraw Stipulation of Dismissal and grant Defendants' Motion to Enforce the Settlement Agreement.[4] Plaintiffs argue that the Magistrate erred by excluding certain testimony. Specifically, Plaintiffs maintain that they should have been permitted to call Robert O'Malley, counsel for Safeskin, as a witness at the July 19, 2004 hearing. Plaintiffs also take issue with the Magistrate's ruling that information regarding the eleven other cases that were being negotiated along with theirs was protected by the attorney-client privilege. Plaintiffs argue that if they had been permitted to present this proof, they would have been able to demonstrate that months after the purported settlement, that in addition to Plaintiffs, one or more of these plaintiffs were still "holding out." Plaintiffs state that this would then show that Safeskin knew there was no authority or agreement to settle. Plaintiffs also argue that O'Malley's negotiating joint settlement of multiple unrelated parties raises serious ethical questions, and the settlement agreement should be deemed unenforceable on public policy grounds.

Plaintiffs also object to the Magistrate's credibility determination regarding Amy Carter's testimony that she had a conversation with Dr. Kraras on March 11, 2003 in which Dr. Kraras accepted Safeskin's offer.

In addition, Plaintiffs object to the Magistrate's inference that settlement was reached on March 11, 2003 because after that date, there were no entries in Roberts'

---

[4]Plaintiffs also objected to the Magistrate's admission of certain exhibits by Safeskin and order sealing the record. However, the Order on Safeskin's Motion to Admit Additional Exhibits and Motion to Seal was in full force and effect, notwithstanding the filing of any objections.

11

records regarding Plaintiffs' case. Plaintiffs point out that on March 29, 2003, an attorney in Roberts' firm, Glen Pritchard, was doing research on whether or not Plaintiffs' case could be dismissed and re-filed in a year.

Plaintiffs also argue that Carter was never admitted to practice in this Court, yet she signed a stipulation of dismissal.

Finally, Plaintiffs object to the Magistrate's reliance on Argo Plastics Products v. City of Cleveland, 474 N.E.2d 328 (Ohio 1984) for the proposition that by authorizing the firm of Baron & Budd to enter into settlement negotiations, the firm had the authority to bind Plaintiffs to a specific sum. Plaintiffs argue that it is well-settled law that it is a client's right to determine whether or not to accept a settlement amount, and by authorizing counsel to negotiate, the client does not vitiate that right.

### III. ANALYSIS

#### A. Exclusion of O'Malley's testimony.

During the hearing, the Magistrate ruled that O'Malley would not be permitted to testify. (Doc. 84, at 69) The Magistrate's ruling was based on Plaintiffs' failure to comply with the Court's prehearing order regarding the identification of witnesses. (Id.) The Magistrate also found that the exclusion of O'Malley as a witness would not cause Plaintiffs prejudice. (Id.)

The Magistrate's Guidelines for an Evidentiary Hearing are attached to the Notice setting the Hearing on the Motion to Withdraw the Stipulation of Dismissal. (See Doc. 36) Included in these Guidelines is a requirement that the parties exchange witness lists not less than ten days before the hearing. The Guidelines provide that a witness not listed will not be permitted to be called. Plaintiffs do not dispute that O'Malley was not included on

12

the witness list exchanged with Defendants, but point out that they had previously served a subpoena on O'Malley, and O'Malley was included on the list presented to Defendants on the day of the hearing. (Doc. 84, at 62, 64)

Federal Rule of Civil Procedure 16(f) provides for sanctions if a party or party's attorney fails to obey a scheduling or pretrial order. These sanctions may be imposed upon the judge's own initiative, and the judge "may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B), (C), (D)." Included in the sanctions which may be ordered under Federal Rule of Civil Procedure 37(c) (B) is an order "prohibiting that party from introducing designated matters in evidence."

Therefore, the Court finds that it was not error for the Magistrate to exclude the testimony of O'Malley at the hearing as a sanction for the failure to comply with the Court's prehearing order.

    B.    <u>Attorney-client privilege</u>.

Plaintiffs argue that they were unable to show that the manner in which the settlement negotiations for Plaintiffs' case and the other cases involving Safeskin are unenforceable as a matter of public policy because the Magistrate excluded information about the eleven other cases based on attorney-client privilege. Plaintiffs also state that this evidence would have demonstrated that several months after the purported settlement of the cases, there were others, aside from Plaintiffs, who had not agreed to the settlement.

The attorney-client privilege bestows upon a client a privilege to refuse to disclose and to prevent others from disclosing confidential communications made between the attorney and client in the course of seeking or rendering legal advice. *Frank W. Schaefer,*

13

*Inc. v. C. Garfield Mitchell Agency, Inc.*, 612 N.E.2d 442, 446 (Ohio Ct. App. 1992).[5] Therefore, unless there was a waiver of the attorney-client privilege by the other plaintiffs with cases against Safeskin, Plaintiffs were not permitted to disclose these confidential communications. As a result, it was not error for the Magistrate to exclude information about the other eleven cases involving Safeskin.

C. <u>Joint settlement of claims</u>.

Plaintiffs argue that the settlement agreement should be deemed unenforceable on public policy grounds because O'Malley required joint settlement of multiple unrelated parties. Plaintiffs cite to *Black v. Bell*, 484 N.E.2d 739 (Ohio Ct. App. 1984) to support their argument that negotiating in such a manner constitutes a failure to negotiate in good faith.

Plaintiffs are correct in that the court in *Black* held that "[a]nyone who requires joint settlement for multiple unrelated parties presumably fails to make good faith negotiation efforts." *Id.* at 744. However, the court's holding was made in the context of analyzing whether there was the necessary finding of a good faith effort to settle the case before awarding prejudgment interest under Ohio Revised Code § 1343.03(C). Plaintiffs have not cited to any caselaw which indicates that the negotiation of a joint settlement is grounds for

---

[5]Ohio Revised Code § 2317.02(A) also provides that the following persons shall not testify in certain respects:

> An attorney, concerning a communication made to the attorney by a client in that relation or the attorney's advice to a client, except that the attorney may testify by express consent of the client or, if the client is deceased, by the express consent of the surviving spouse or the executor or administrator of the estate of the deceased client and except that, if the client voluntarily testifies or is deemed by section 2151.421 of the Revised Code to have waived any testimonial privilege under this division, the attorney may be compelled to testify on the same subject.

14

invalidating the settlement agreement. In fact the Code of Professional Responsibility provides:

> A lawyer who represents two or more clients shall not make or participate in the making of an aggregate settlement of the claims of or against his clients, unless each client has consented to the settlement after being advised of the existence and nature of all the claims involved in the proposed settlement, of the total amount of the settlement, and of the participation of each person in the settlement.

DR 5-106(A). Therefore, aggregate settlement of claims is permissible if certain conditions are met. Plaintiffs have not alleged that these conditions have not been met. Therefore, the Magistrate did not err by rejecting Plaintiffs' argument that the manner in which O'Malley was negotiating settlement renders the settlement agreement unenforceable.

D. <u>Credibility determination regarding Amy Carter's testimony</u>.

Plaintiffs object to the Magistrate's determination regarding whether Dr. Kraras expressly authorized Baron & Budd to accept the specific amount offered. Plaintiffs' object to the Magistrate's credibility determination regarding Carter's testimony.

The Magistrate's credibility determination was based on Carter's position as an experienced litigator and her specific recollection of consent being given. The Magistrate reasoned that the downside for Carter of fabricating her testimony or falsely communicating to Presby that Dr. Kraras had accepted the offer was significant, and the personal benefit to Carter in settling the cases was negligible. (Doc. 77, at 15-16) This led the Magistrate to conclude this evidence showed that Dr. Kraras said something in her March 11, 2003 conversation with Carter which reasonably led Carter to conclude that Dr. Kraras had accepted the amount offered. (Id. at 16) The Magistrate cited other evidence in the record which bolstered his conclusion: Presby confirmed the settlement in writing to O'Malley and

15

Roberts; Roberts ceased working on the Kraras case and made no further inquiries as whether the cases had settled; and releases were prepared and sent. (Id. at 15)

Plaintiffs also argue that in finding that a settlement agreement had been reached on March 11, 2003, the Magistrate ignored an affidavit by O'Malley. Plaintiff states that the affidavit contains a statement by O'Malley that on February 13, 2003, Presby advised him that the twelve plaintiffs had agreed to settle their claims. Plaintiff argues that this refutes the Magistrate's conclusion that by February 17, 2003, Baron & Budd had obtained a settlement figure for the Kraras case.

The Court finds that the Magistrate's finding that Baron & Budd had obtained a settlement figure by February 17, 2003 for the Kraras case is supported by evidence in the record. On February 17, 2003, Presby emailed Roberts with a list of the allocation of the total settlement amount with Safeskin, and Dr. Kraras' name is included along with an amount on that list. Therefore, by February 17, 2003, Baron & Budd did have a figure for the Kraras case.

Moreover, the Court finds that there is nothing in O'Malley's affidavit (Doc. 19, Ex. A) which is contrary to the Magistrate's findings. In his affidavit, O'Malley explains that on February 13, 2003, Presby advised him that Baron & Budd had final agreements from the various plaintiffs, including the Kraras plaintiffs, to settle their lawsuits. (Id. ¶ 7) This is consistent with the Magistrate's findings that at some point in February, and clearly after February 17, 2003, Dr. Kraras authorized Baron & Budd to enter into settlement negotiations. (Doc. 77, at 15) The Court notes that the Magistrate made a distinction between February 17, 2003 - the date after which Dr. Kraras authorized Baron & Budd to

enter into settlement negotiations - and March 11, 2003 - the date Dr. Kraras accepted Safeskin's offer.

Upon *de novo* review of the record, the Court finds that the Magistrate did not err in his credibility determination regarding the testimony of Carter and in his conclusion that Dr. Kraras expressly authorized Baron & Budd to accept Safeskin's offer.

E. <u>Inference based on absence of entries</u>.

Plaintiffs object to the Magistrate's inference that a "curious void in Mr. Robert's records regarding Plaintiffs' case" indicates that the case had settled. Plaintiffs argue that the Magistrate's inference is refuted by the evidence showing that as late as March 29, 2003 Glenn Pritchard in Robert's firm was researching whether Plaintiffs could dismiss their case and later re-file.

The Magistrate's observation regarding the "curious void" is based on the evidence in the record which showed that Roberts made no inquiry after March 10, 2003 about whether the cases settled, and made no time entries in the Kraras file until January of 2004. (Doc. 77, at 13, 14) The Magistrate did discuss the evidence showing that Pritchard was researching the issue of dismissing and re-filing in response to an email from Carter. (Id.) The Magistrate stated:

> Although it is unclear why Ms. Carter asked for that information, it does not necessarily mean that she harbored doubts about the fact of settlement. On balance, the Court concludes that this e-mail is not persuasive evidence on the question of whether on March 11, 2003 Baron & Budd had authority to settle and did settle Plaintiffs' claims against Safeskin.

(Id.) Upon *de novo* review of the record, the Court does not reach a conclusion contrary to that of the Magistrate. Therefore, the Magistrate did not err in relying on the void in

17

Robert's records as an indication that Dr. Kraras had authorized Baron & Budd to accept Safeskin's offer.

F.    Amy Carter's signature on the Stipulation of Dismissal.

Plaintiffs argue that Carter was never admitted to practice in this Court, yet she signed the stipulation of dismissal which was entered into the record. (See Doc. 12)

The Court notes that it is not clear whether this issue was ever raised before the Magistrate. Nevertheless, the Court finds that it is Carter's testimony that she did have authority to sign the stipulation, and it is Roberts' testimony that he does not recall whether Carter asked for permission to sign his name to the stipulation. Without strong evidence to the contrary, the Court must find that Carter did have permission to sign the stipulation. Therefore, the stipulation was properly entered, and Carter's signature on the stipulation on behalf of Roberts is not grounds for withdrawing the stipulation of dismissal.[6]

G.    Baron & Budd's authority to accept a settlement amount.

Plaintiffs argue that the Magistrate erred in its legal determination that by authorizing Baron & Budd to enter into settlement negotiations, Plaintiffs authorized the firm to bind them to a specific sum. Plaintiffs argue that the case cited by the Magistrate, *Argo Plastic Products Co. v. City of Cleveland*, 474 N.E.2d 328 (Ohio 1984), is inapposite to Plaintiffs' situation because the plaintiffs in that case had every reason to believe the settlement

---

[6]The Court notes that under the Local Rules, one attorney may sign for another attorney. See S.D. Ohio Civ. R. 83.5(d). However, the full signature must appear and initials "are unacceptable because the Court must determine who actually signed the document." *Id.* It appears that Carter only signed using her initials, which would be improper under the Rules. Nevertheless, based on her testimony, the Court knows that Carter signed the stipulation. Moreover, the Court finds that it would be improper to allow Plaintiffs to withdraw the stipulation on such a technicality.

agreement was final; and the City of Cleveland did not dispute that its attorney had authority to settle with the plaintiffs.

In *Argo*, the court was considering whether the trial court properly denied the city's Ohio R. Civ. P. 60(B) motion.[7] *Id.* at 331. The city argued that its attorney did not have the authority to settle the action in the amount for which it was settled. *Id.* at 330. The city maintained that the approval of the city's law director was needed for any amount over $2,500, yet the city's attorney settled the lawsuit for over $500,000. *Id.* The court held the city was not entitled to relief from judgment under Rule 60(B) because an earlier decision of the court had held: "As a general rule, the neglect of a party's attorney will be imputed to the party for the purposes of Civ.R. 60(B)(1). *Id.* at 331, citing, *GTE Automatic Electric v. ARC Indus.*, 351 N.E.2d 113 (Ohio 1976).

First, even though it does not appear that a finding of authority was relevant to the holding of the *Argo* case, the Magistrate did find that Baron & Budd had authority to settle Plaintiffs' case with Safeskin.

Second, even if the Court were to read the Magistrate's R&R as Plaintiffs do - that is, authority to settle is equivalent to authority to bind a client to a specific sum - the Court notes that the Magistrate ultimately found that Kraras did give Baron & Budd authority to

---

[7]Ohio R. Civ. P. 60(B) provides in relevant part:

On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(B); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation or other misconduct of an adverse party; (4) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (5) any other reason justifying relief from the judgment.

settle Plaintiffs' case for a specific amount on March 11, 2003. Since the Court finds that this conclusion was not in error, the applicability of *Argo*, and the Magistrate's citation to that case, has little bearing on this Court's decision to adopt the R&R.

## III. CONCLUSION

Upon *de novo* review of this matter, the Court finds no error in the Magistrate Judge's Report and Recommendation. Accordingly, the August 26, 2004 Magistrate Judge's Report and Recommendation (Doc. 153) is hereby **ADOPTED**. The Court hereby orders that Plaintiffs' Motion to Withdraw the Stipulation of Dismissal (Doc. 18) be **DENIED**; and Defendant Safeskin's Motion to Enforce the Settlement Agreement (Doc. 19 & 63) be **GRANTED**.

**IT IS SO ORDERED.**

_____
Michael H. Watson
United States District Judge